******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ROBERT SURGENT *v.* GERALDINE SURGENT
## (AC 46632)

Elgo, Suarez and Westbrook, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant had previously been dissolved, appealed from the trial court's judgment granting his motion for modification of unallocated child support and alimony payable to the defendant. The plaintiff claimed, inter alia, that the court improperly considered the defendant's allegation that he had failed to share with her certain proceeds of a postdissolution sale of stock when it was undisputed that no motion raising that issue had been filed with the court. *Held*:

The trial court abused its discretion in considering evidence regarding the plaintiff's allegedly contemptuous conduct in failing to split the proceeds of a postdissolution stock sale with the defendant and the court's award to the defendant of a commensurate reduction in an arrearage she owed to the plaintiff was harmful and violated the plaintiff's due process rights, as the court admitted testimony regarding that conduct for the limited purposes of assessing credibility and establishing the plaintiff's total financial picture, and this issue had not been properly raised in a motion by the defendant with due notice to the plaintiff.

The trial court did not improperly modify the terms of the alimony provision in the parties' separation agreement in construing the agreement to require the plaintiff to issue the final alimony payment in 2028, beyond the term of the alimony as agreed to by the parties based on the plaintiff's 2027 income, as such agreement anticipated that the final payment to the defendant would be calculated on the basis of the plaintiff's year-end bonuses for employment in 2027, which would not be calculated and awarded until 2028.

Argued January 9—officially released September 2, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Stanley Novack*, judge trial referee; judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Moukawsher, J.*, granted the plaintiff's motion for modification of unallocated child support

and alimony, and the plaintiff appealed to this court. *Reversed in part; judgment directed.*

*Leslie I. Jennings-Lax*, for the appellant (plaintiff).

*Opinion*

ELGO, J. In this postdissolution matter, the plaintiff, Robert Surgent, appeals from the judgment of the trial court granting his motion for modification of unallocated child support and alimony payable to the defendant, Geraldine Surgent. The plaintiff contends that the court, in modifying his alimony obligation, improperly (1) considered the defendant's claim that he had failed to share with her the proceeds of a postdissolution sale of stock when it is undisputed that no motion raising that issue had been filed with the court, and (2) modified a nonmodifiable term of the alimony award. We agree with the plaintiff as to the first claim and, accordingly, reverse the judgment of the trial court only with respect to the order pertaining to the postdissolution sale of the stock.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The parties married in 1999, and two children were born of the marriage. Following the subsequent breakdown of their marriage, the parties voluntarily entered into a comprehensive separation agreement (agreement). On September 10, 2015, the court dissolved the marriage, finding that it had broken down irretrievably, and incorporated the agreement into its judgment of dissolution.

The following provisions of the agreement are relevant to the plaintiff's appeal. Article III addressed the plaintiff's obligation to pay the defendant unallocated alimony and child support. The plaintiff was obligated to pay to the defendant, as of the first of each month and for "an otherwise non-modifiable" term of twelve years, a payment calculated in relation to his "gross

annual earned income from employment."[1] Section 3.1 of the agreement provided that these payments "shall be made as and when [g]ross [e]arned [i]ncome from [e]mployment is received" by the plaintiff. Section 3.2 of the agreement defined gross annual earned income from employment to mean "all compensation paid and transferred by the [plaintiff's] employer to him on account of personal services rendered by the [plaintiff] and any and all earnings of any nature received by the [plaintiff] in the form of cash or cash equivalents or which the [plaintiff] is entitled to receive from any and all sources rendered by the [plaintiff] by way of his current or future employment, before deductions . . . including but not limited to: (a) salary and/or base salary . . . (d) bonus, guaranteed bonus and/or performance awards . . . ." Potential deductions were laid out in some detail, including "carried interest distributions which shall include payments, transfers, and accruals made on account of the [plaintiff's] ownership or carried interest in any entity including a general partnership, limited partnership, limited liability company or corporation; provided the [plaintiff's] ownership or carried interest is the result, in whole or in part, or is in some way related to the [plaintiff] having rendered personal services. [The plaintiff's] carried interest shall include all payments and distributions of any kind which the [plaintiff] receives in whole or in part, or is in some way related to the [plaintiff] having rendered personal services, is entitled to, or otherwise accruing to the [plaintiff] . . . ." Section 3.1 of the agreement further states: "Payments to the [defendant] shall be made as and when [g]ross [e]arned [i]ncome from [e]mployment is received by the [plaintiff]. For the purposes of calendar year 2015 the calculations of the

---

[1] The agreement also contained a provision capping the amount of the plaintiff's income subject to any alimony order at the nonmodifiable amount of $2.5 million.

amounts due to the [defendant] shall be based on [g]ross [e]arned [i]ncome from [e]mployment received by the [plaintiff] between the date of dissolution and December 31, 2015, with a new annual calculation commencing on January 1, 2016." Because of the structure of the plaintiff's compensation, including the disbursement of bonuses in the year(s) subsequent to the year(s) in which he had earned them, the agreement provides that the plaintiff would engage in a "true up" with the defendant when those bonuses were disbursed to him.[2] In particular, section 3.4 of the agreement states: "Within thirty (30) days after December 31 of each calendar year in which alimony and/or child support is payable to the [defendant], the [plaintiff] shall provide the [defendant] with all documents necessary to confirm his gross earned income from employment from all sources, including bonuses. Not later than March 15 of each year, commencing March 15, 2016, the parties shall determine whether the [plaintiff] has paid to the [defendant] the correct amount of unallocated alimony and child support, as the case may be for the immediately preceding calendar year." This arrangement proceeded without court involvement until 2019.

In 2019, the plaintiff filed a postjudgment motion to modify his unallocated alimony and child support obligations because the parties' children had turned eighteen and no longer were entitled to child support under the terms of the agreement.[3] The parties filed proposed postjudgment orders pursuant to Practice Book § 25-30. In her proposed postjudgment orders, the defendant asked for, inter alia, one half of the "value

---

[2] As will be explained in further detail subsequently in our opinion, the parties ultimately disagreed as to how to interpret the agreement, though this disagreement did not emerge until the closing arguments at the hearing on the plaintiff's motion to modify.

[3] The plaintiff also sought modification of life insurance requirements as well as a court order for the defendant to refinance the mortgage on the former marital residence. Neither of those issues are germane to this appeal.

of the Straight Path Communications, Inc. shares as of the value on the date of the dissolution of the marriage" and the division of a "[p]reviously undisclosed Goldman Sachs UK retirement plan . . . ." In a memorandum of law submitted at the request of the court, the defendant urged the court to take into consideration her allegation that the plaintiff "has failed to comply fully with the orders of the court with respect to equitable distribution. Specifically, the defendant has claimed that the plaintiff failed to distribute to her the proceeds from the sale of stock he owned at the time of judgment, but failed to share with her according to the judgment. In addition, the defendant was able to confirm that at the time of judgment the plaintiff had a pension in the United Kingdom that had not been properly disclosed by the time of judgment, thereby depriving her of a substantial equitable distribution benefit." The defendant asked the court to exercise its discretion in any retroactive reward, "limiting the retroactivity order to amounts that are consistent with the total circumstances of the parties, including their respective incomes."

The court held a hearing on the plaintiff's motion to modify on April 17, 2023.[4] The plaintiff and the defendant testified, and their respective financial affidavits were admitted into evidence. The plaintiff testified that, at the time he entered into the agreement, he was employed by Tudor Investments, but was employed by Goldman Sachs when he filed the motion to modify in November, 2019. The plaintiff further testified that, when he left Goldman Sachs in December, 2019, he forfeited various restricted stock components that had been part of his income. The plaintiff then accepted a position with the firm of Neuberger Berman in March,

---

[4] As the court noted in its memorandum of decision, "a substantial portion of the delay in deciding the motion to modify [was] the court's fault" due to the COVID-19 pandemic.

2020, where his compensation had both a "salary component" and a "performance component." He testified that the performance component "can be cash, or it can be a contingent compensation plan, which is known as deferred compensation that you do not receive unless you remain for another three years with the firm." The plaintiff further clarified that any contingent compensation granted in January of a given year would be disbursed in one-third increments, every January for three subsequent years.

On cross-examination, the defendant's counsel questioned the plaintiff on his predissolution employment and whether the plaintiff had accrued a pension at Goldman Sachs that he did not disclose on his 2015 financial affidavit. The plaintiff's counsel objected on the grounds that such questioning was irrelevant. The following colloquy then transpired:

"[The Defendant's Counsel]: Your Honor, I expect to inquire of the witness to show the court that the witness had taken steps to conceal income and assets, and that goes to his credibility.

"The Court: But that's the only purpose you're attempting to use it? Because are you going to pursue the proposed order you submitted that you want some sort of division of this piece of property?

"[The Defendant's Counsel]: Yes, Your Honor, because I think that's relevant to—also to the claim for retroactivity.

"The Court: Well, it's a different thing to say that, you know, that there were certain things that he hasn't disclosed that you think damage his credibility. Then there's a second consideration where you might say that I should take it into account when considering his total financial picture. Then there's a third thing where you might say I would like you to give a postjudgment

property order dividing this money between them. Are you—which of these things, or all of them are you—you seeking to use it for?

"[The Defendant's Counsel]: One and two, Your Honor. . . .

"The Court: I didn't think you were going to (indiscernible) three, that's what I wanted to clear up. In effect, [the plaintiff's counsel] will be able to argue that that's what you're trying to do through the back door. But, [Plaintiff's Counsel], isn't it true that I am able to consider his total financial picture when considering what to do about this unbundling and future alimony? I can look at his total financial picture, including any pension he has from Goldman Sachs, right?

"[The Plaintiff's Counsel]: I don't have an objection to that, Your Honor. Does the answer that [the defendant's counsel] just gave, does that mean he's withdrawing his claims in his proposed orders with respect to asking the court to do something for which there's no motion.

"The Court: I am assuming that he is withdrawing any proposal, which he did write into his proposed orders, of a division of this pension asset because he knows that . . . I don't have the power to do that. So, what he wants to do is have me consider it as a question of [the plaintiff's] credibility and, second of all, about taking into account his total financial picture when looking at what he has and doesn't have for purposes of a future alimony award. . . . [Y]ou don't object to, at least, the total financial picture part, do you, [Plaintiff's Counsel]?

"[The Plaintiff's Counsel]: I do not, Your Honor."

Shortly thereafter, the defendant's counsel inquired about the plaintiff's ownership of stock in a company

called Straight Path (stock), which the plaintiff purchased in September, 2014, and sold after the dissolution of his marriage to the defendant. The plaintiff's counsel objected to this line of questioning on relevancy grounds, and the court inquired as to whether the defendant was pursuing this line of questioning for the same reasons as the inquiry regarding the Goldman Sachs pension, namely, for credibility purposes as well as for the court to consider as a part of the plaintiff's total financial picture. The defendant's counsel then represented that the plaintiff had sold the stock, postjudgment, without dividing it with the defendant. The court then noted that, "[w]ell, for the purposes of understanding shifts in his financial picture postjudgment, it's appropriate for me to hear it. As to whether it goes to his credibility . . . I'm not sure how his credibility, frankly, has been put . . . into dispute here, yet. But, in any case, it comes in for the limited purpose anyway."[5]

---

[5] During subsequent questioning, the plaintiff denied that he had not divided the asset with the defendant and testified that he had discussed the sale of the stock with the defendant "in her office" and that they had "split the loss" on the stock, which was sold at $10 per share. In her testimony, the defendant denied receiving any portion of the proceeds of the sale of the stock. The plaintiff's counsel did concede that 1000 shares of this stock had come out of the plaintiff's Fidelity account in September, 2015, in the amount of $42,000. During questioning of the plaintiff, the plaintiff's counsel indicated that the stock was sold for $42,000 in 2015, though the plaintiff denied receiving cash for the sale of the stock and stated that he "did not take 100 percent of the proceeds." The plaintiff's counsel also asked the plaintiff to confirm that it was sold for $19,000. The plaintiff then testified that he had purchased additional stock from the same company after the dissolution of his marriage to the defendant. The plaintiff's counsel then noted to the court that there were several transfers of stock during the relevant time period, one of which "we are presuming because we don't have all the documents because we didn't think we were doing this" went into the plaintiff's account and was subsequently sold. The defendant's counsel then remarked, "I don't know how we can—we have no possible way of identifying which shares got transferred, and which shares were sold. . . . [T]he judgment required the division of the stock . . . . The [plaintiff] never did that. He just continued to trade it." The plaintiff's counsel stipulated to the fact that the plaintiff owned 1000 shares prior to the dissolution of his marriage, but stated that "there's a difference of opinion

The defendant testified that she had not received a "true up" in 2017, related to the 2016 alimony that she had received from the plaintiff. When the defendant was asked why she was claiming an arrearage for alimony in 2016, the plaintiff's counsel objected, noting that there was no pending motion before the court "with respect to a claim for an alimony arrearage for 2016 or 2017." The court then responded that, "a motion for contempt would be appropriate for that" but that, "if it's established that [the plaintiff] underpaid certain court required payments, and I have to exercise a judgment call about retroactivity and how much retroactivity, why can't I take that into account?" The plaintiff's counsel responded, arguing that "[w]e're seeking retroactivity back to January 1 of 2020, not back to 2016, not back to 2017. So, the orders that we're seeking ha[ve] nothing to do with that. This is also, Your Honor, a backhanded way to try to get this court to find an arrearage when no motion's been filed, and, therefore, there is no due process to my client whatsoever to deal with these claims."[6] Later in the hearing, the plaintiff's counsel again argued that the plaintiff's due process rights were being violated because the defendant should have brought a "proper motion" and should not use the plaintiff's motion as "an attempt to add onto this motion, it's not fair to my client."

During closing arguments, the defendant's counsel broached the topic of how to interpret the agreement, noting that section 3.2 provides that "gross annual earned income from employment means—shall be all

as to what happened there." In its memorandum of decision, the court found that the plaintiff "did not properly share" the proceeds of the sale of the stock with the defendant, which he "sold for around $40,000 despite a court order" to share the proceeds with the defendant.

[6] As the plaintiff's counsel put it during closing argument, the plaintiff was seeking "a modification of the percentages of what is in the court order now as an unallocated alimony and support order. He wants it retroactive to the date of service, and he wants a decrease in the life insurance."

compensation paid and transferred by the husband's employer to him on account of personal services rendered by the husband. Transferred to him is when did he get it in his hands? It doesn't say accrued, it's transferred." The court interjected, "[w]ell, wait a minute, you're just going too fast for me, because nobody has talked about this before, and I want to know—I want to have the language in front of me."

The defendant's counsel then argued, repeatedly, that the court should interpret the language of the agreement to mean that the plaintiff should pay the defendant alimony that is calculated for money received by the plaintiff during a calendar year.[7] Pointing to the year 2016, the defendant's counsel argued that "the alimony paid [in 2016] was only 30.8 percent of all of the money that he received in that year, and there's no suggestion that she got any portion of [the] 2015 bonus." When asked by the court if the plaintiff had stopped paying his alimony obligation under the agreement, the defendant's counsel referred again to 2016, stating that "the claim is that he did not pay her all she was entitled to in 2016."

---

[7] In arguing that the plaintiff had incorrectly reported his income during the annual true ups in 2016 and 2019, the defendant's counsel argued: "How better could you have . . . proof of his earned income than his W-2 income on his tax return?" "[T]he intent of the parties clearly, it's not ambiguous, would be . . . you take the money that he actually received by getting a transfer from the employer in a given year . . . ." "What other possible instruction could you place on the phrase money earned and transferred to him. Nothing is transferred to him until it shows up in his paycheck." The defendant's counsel further argued: "[L]et's say that alimony ends on December 31st, 2027. . . . And, on 2028, he gets a bonus check from his employer, [the defendant] doesn't share in that because it wasn't transferred to him in the year." The defendant's counsel also pointed to federal tax law, noting that federal income tax is due on funds actually received during a calendar year. As he stated: "For the [plaintiff's] tax return has to show all of the W-2 income actually received in a certain tax and calendar year. If you—if [the defendant] were not entitled to alimony on the actual earned cash transferred to him and received in a particular calendar year, this would make no sense. It just—it just wouldn't."

The plaintiff's counsel argued, inter alia, that the agreement, section 3.2, provided for noncash compensation to be calculated into the alimony payments owed to the defendant, which would not be reflected in the plaintiff's W-2 as income. Accordingly, counsel argued that merely looking at the plaintiff's W-2 for a specific year would not accurately reflect what he would be responsible for paying, with respect to alimony, to the defendant. The plaintiff's counsel then argued that "the years 2020 through 2023, with respect to all of this, was not disputed. What is in dispute, apparently, according to [the defendant's counsel], are the years that predate this motion for which there has been no motion filed. I don't believe that that is something that's relevant . . . in terms of dealing with the modification. If [the defendant] truly believes that she hasn't been paid the money to which she was entitled, then let's go back and figure that out and, perhaps, she should put that square before the court . . . in a motion." In sum, the plaintiff argued that his due process rights would be violated if the court took up these claims of arrearage, and that the defendant should bring a motion of her own.

In its memorandum of decision, the court found that there had been a substantial change in circumstances since the dissolution of the marriage because the children of the marriage were no longer eligible for child support. The court noted that General Statutes § 46b-82 provides a number of "flexible" factors that the court should consider when hearing a motion to modify based on a substantial change of circumstances.[8] The court

---

[8] General Statutes § 46b-82 (a) provides: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. The order may direct that security be given therefor on such terms as the court may deem desirable, including an order pursuant to subsection (b) of this section or an order to either party to contract with a third party for periodic payments or payments contingent on a life to the other party. The court may order that a party obtain life insurance as such security

further found that the plaintiff "makes what most people would see as a lot of money in the investment field—recently around $1.2 million a year." With respect to the defendant, the court found that, "for reasons unexplained, [she] earns virtually no money," although she did have a "$1 million investment portfolio." As a result, the defendant was "dependent on the depletion of her assets and on alimony" from the plaintiff which has been "roughly" around $400,000 to $450,000 per year. Noting that "[n]either proposal gets near providing [the defendant] with enough to pay her expenses," the court ordered that the plaintiff pay alimony, retroactive to the approximate time of the filing of the motion to modify, at a rate of one third of his first $500,000 of income, followed by one quarter on any subsequent $1,000,000 of income, and one tenth of everything the plaintiff earns between $1,501,000 and $2,500,000.

The court also noted that the defendant had "not convinced the court" that the plaintiff's actions were "unreasonable" or otherwise "wilfully in defiance of the court's orders." The court then explained that it would not rely on the defendant's interpretation of the agreement because, in order to calculate what the plaintiff earned in a given year, "we must look at what they paid him in exchange for his work that year even if he gets that pay a few weeks into the new year."

unless such party proves, by a preponderance of the evidence, that such insurance is not available to such party, such party is unable to pay the cost of such insurance or such party is uninsurable. In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment."

The court also found that the plaintiff had not divided the proceeds of the sale of the stock with the defendant and ordered that any retroactive order would be reduced by $20,000—or one half of the proceeds therefrom. With respect to the Goldman Sachs pension, which the court noted the defendant claimed had been concealed by the plaintiff at the time of the dissolution agreement, the court found that it had no jurisdiction "to modify its property awards directly . . . or indirectly by means of some adjustment of retroactivity."[9]

After the court issued its ruling, the defendant filed a postjudgment motion for clarification. Noting that the court had adopted the plaintiff's proposed methodology for the determination of alimony, the defendant requested clarification as to whether "[w]hen alimony terminates, if not sooner, at the end of 2027, [the defendant was] entitled to the bonus received by the plaintiff in the year 2028, for work that he performed" in 2027. The plaintiff objected to the defendant's motion for clarification, arguing that the underlying motion that was the subject of the April 17, 2023 hearing was to "modify the alimony based upon the child support component no longer being applicable" and that, because there was no effort on the part of the plaintiff "to alter the language of the alimony as set forth in the agreement," the defendant's request for clarification was "beyond the scope of the [plaintiff's] motion." By order dated June 6, 2023, the court granted the defendant's motion for clarification, stating simply: "The court agrees that she is so entitled."[10]

---

[9] The court also ordered the parties to file with the court a calculation of the sum due under the terms of the order and also granted the plaintiff's request to modify his life insurance plans.

[10] In February, 2024, the plaintiff filed a request with the trial court to file a late motion for articulation of the court's June 6, 2023 order pursuant to Practice Book § 66-5. In May, 2024, the administrative judge for the judicial district of Stamford-Norwalk, Judge Blawie, denied the motion. In so doing, Judge Blawie explained that the judge who had issued the June 6, 2023 order, Judge Moukawsher, had resigned in October, 2023. For that reason, Judge Blawie concluded that it was "simply impossible for another judge

Subsequently, the plaintiff filed a motion to reargue, asserting that the court had improperly addressed the issue of the stock transfer. The plaintiff emphasized that "there was no motion pending [that gave] the plaintiff notice that the defendant intended to pursue any claim that she had not received a portion of the property division from some eight years prior to the hearing," citing *Swain* v. *Swain*, 213 Conn. App. 411, 419, 277 A.3d 895 (2022), for the proposition that a trial court is not permitted to decide issues outside of those raised in the pleadings.[11] The plaintiff further noted that, when the property division issue was raised by the plaintiff at the April 17, 2023 hearing, "the issue was specifically noted as being raised for credibility purposes." The plaintiff thus asked the court to strike the language addressing the issue of the stock transfer from the memorandum of decision and vacate the portion of its order that provided the defendant with a $20,000 credit for the stock transfer. By order dated June 5, 2023, the court denied that request, stating: "Functionally, the court allowed the defendant to orally modify the motions pending before the court to accommodate the relief she sought in the proposed orders [she] submitted at trial. The plaintiff did not deny that he failed to comply with the court's order on this subject nor did he suggest that, if given more time, he could come up with some sort of defense to the claim. The court does not believe that the plaintiff was prejudiced by the court

to attempt to further articulate the reasoning behind [Judge Moukawsher's] orders . . . ." See *Ocwen Loan Servicing, LLC* v. *Mordecai*, 209 Conn. App. 483, 497 n.14, 268 A.3d 704 (2021) ("[i]f a judge other than the one who rendered a decision is permitted to attempt to divine from its review of the record the factual and legal basis for a decision, the result, effectively, is a wholly new decision").

[11] In *Swain*, this court held that the "court is not permitted to decide issues outside of those raised in the pleadings. . . . It is equally clear, however, that the court must decide those issues raised in the pleadings. . . . This rationale extends equally to motions." (Internal quotation marks omitted.) *Swain* v. *Swain*, supra, 213 Conn. App. 419.

taking the issue up. Indeed, the opposite is true. He and the defendant would both be prejudiced by requiring new motion practice, further years of delay, and thousands of dollars in attorney's fees to litigate the issue. A court sitting in equity can do better than that." This appeal followed.[12]

I

The plaintiff first claims that the court improperly considered the defendant's claim that he failed to share with the defendant certain proceeds of a postdissolution sale of stock. Specifically, the plaintiff contends that the court's order reducing the retroactive payments owed to the plaintiff by the defendant—in the amount of $20,000—should be vacated as the plaintiff did not raise such a claim in any motion before the court. Because he had no notice that this issue was going to be addressed at the hearing on his motion to modify, the plaintiff submits that his due process rights were violated by the court's consideration of that issue. The plaintiff also argues that the court admitted the testimony regarding the sale of the stock for the limited purpose of assessing credibility and giving the court information as to the plaintiff's total financial picture, and that the court's order exceeded those limitations. We agree.

First, we note the general principles that guide our analysis of this claim. "It is axiomatic that the appellant bears the burden of providing this court with a record adequate to review his claim of error. . . . [I]n the face of an ambiguous or incomplete record, we will presume, *in the absence of an articulation*, a trial court acted

---

[12] The defendant appeared, but has not participated, in this appeal. Because she did not file an appellate brief, we ordered that the appeal shall be considered on the basis of the plaintiff's brief, oral argument, and the record. See, e.g., *Ammar I.* v. *Evelyn W.*, 227 Conn. App. 827, 830 n.2, 323 A.3d 1111 (2024).

correctly, meaning that it undertook a proper analysis of the law and made whatever findings of the facts were necessary." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Zaniewski* v. *Zaniewski*, 190 Conn. App. 386, 396, 210 A.3d 620 (2019). As discussed previously in this opinion, the plaintiff did file a motion for articulation. We note that, in denying the request to file a late motion for articulation, the court did not take up the timeliness of the request. Moreover, because Judge Moukawsher had resigned, the court concluded that it was impossible for any other judge to articulate the reasoning behind Judge Moukawsher's orders and denied the plaintiff's motion. The plaintiff then filed a motion for review with this court. We granted review but denied the relief requested.

The plaintiff contends that he has done all that can reasonably be expected to provide us with an adequate record on this issue, and we agree. We have made an exception to the general rule presuming the correctness of a trial court's decision for those circumstances in which "a party has done all that can reasonably be expected to obtain an articulation but has been thwarted through no fault of [his] own." Id., 397; see also id. (declining to apply presumption of correctness to trial court decision that was devoid of any factual findings in support of its conclusions).

With respect to the scope of the court's decision, we note that, "[i]n general, a court's decision is restricted to those issues raised by the parties in their pleadings and in argument." *Swain* v. *Swain*, supra, 213 Conn. App. 418. "Our rules of practice require that every motion directed toward pleading or procedure, unless relating to procedure during the course of a trial, be in writing. . . . The purpose of requiring written motions is not only the orderly administration of justice . . . but the fundamental requirement of due process of law." (Citations omitted.) *Connolly* v. *Connolly*, 191

Conn. 468, 475, 464 A.2d 837 (1983). Further, "in the context of motions to modify support orders, we have held that a court's reliance on a ground not raised in a motion to modify is an abuse of discretion in the absence of an amendment to the motion." *Petrov* v. *Gueorguieva*, 167 Conn. App. 505, 514, 146 A.3d 26 (2016).

Additionally, although we acknowledge the court's broad equitable power in acting on postdissolution motions for modification; see *Zaniewski* v. *Zaniewski*, supra, 190 Conn. App. 397; our appellate courts "repeatedly have emphasized that [e]vidence [that] is offered and admitted for a limited purpose only . . . cannot be used for another and totally different purpose." (Internal quotation marks omitted.) *State* v. *Robles*, 348 Conn. 1, 21, 301 A.3d 498 (2023). Therefore, "[i]n the context of a postjudgment appeal, if a review of the record demonstrates that an unpleaded [issue] actually was litigated at trial without objection such that the opposing party cannot claim surprise or prejudice, the judgment will not be disturbed on the basis of a pleading irregularity. . . . In making this determination, our courts look not only to what occurred during the hearing itself . . . but also to whether actions occurring prior to the hearing placed the party on notice as to the unpleaded issues or facts." (Internal quotation marks omitted.) *Swain* v. *Swain*, supra, 213 Conn. App. 419–20.

Moreover, "[a] fundamental premise of due process is that a court cannot adjudicate any matter unless the parties have been given a reasonable opportunity to be heard on the issues involved . . . . It is a fundamental tenet of due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 10, of the Connecticut constitution that persons whose . . . rights will be affected by a court's decision are entitled to be heard at a meaningful

time and in a meaningful manner. . . . Whe[n] a party is not afforded an opportunity to subject the factual determinations underlying the trial court's decision to the crucible of meaningful adversarial testing, an order cannot be sustained." (Internal quotation marks omitted.) *Ill* v. *Manzo-Ill*, 210 Conn. App. 364, 376–77, 270 A.3d 108, cert. denied, 343 Conn. 909, 273 A.3d 696 (2022); see also *Pritchard* v. *Pritchard*, 103 Conn. App. 276, 288, 928 A.2d 566 (2007) ("[b]ecause the court acted in violation of the state's due process rights to be given adequate notice of the issues the court intended to address, and, accordingly, to be given a reasonable opportunity to be heard in sufficient time to prepare a position on the issues involved, the action taken by the court cannot stand").

In the present case, the plaintiff did object—in a timely and consistent manner—to the introduction of the testimony regarding his allegedly contemptuous conduct in failing to split the proceeds of the postdissolution stock sale with the defendant. Although the plaintiff did have some notice of the defendant's claim when the defendant filed her proposed orders one week before the hearing on the plaintiff's motion, the court specifically tailored the admission of the testimony in question toward its assessment of the plaintiff's overall financial picture as well as for credibility purposes, rather than to support a claim that the plaintiff failed to comply with the terms of the agreement.

Moreover, the court acknowledged that the issue would "arguably [be] best addressed through a motion for contempt" but that "the efficiency of addressing it here outweighs the possible propriety of addressing it there." As the plaintiff repeatedly argued before the court, the failure of the defendant to file her own motion to raise these issues implicates due process and is inherently unfair. This is especially true with issues effectively charging a party with contempt of court. "[T]here

are constitutional safeguards that must be satisfied in indirect contempt cases. It is beyond question that due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. . . . [U]nder Connecticut law, such proceedings should be proven by clear and convincing evidence." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Brody* v. *Brody*, 315 Conn. 300, 317–19, 105 A.3d 887 (2015).

In light of the plaintiff's objections and the court's assurance at the April 17, 2023 hearing that this testimony would be admitted for the "limited purpose" of assessing credibility and establishing the plaintiff's total financial picture, we conclude that the court abused its discretion in considering this evidence beyond those stated purposes. We further conclude that, having determined that the plaintiff failed to share the proceeds of the stock sale with the defendant—an issue not properly raised in a motion with due notice to the plaintiff—the court's award to the defendant of a commensurate reduction in the arrearage owed to the plaintiff was harmful and violated the plaintiff's due process rights.

II

The plaintiff next claims that the court, in responding to the defendant's request for clarification, improperly modified the nonmodifiable term of the alimony. The plaintiff argues that the court misconstrued the unambiguous language of the agreement, which terminates alimony in September, 2027. In essence, the plaintiff contends that, in construing the agreement to require the plaintiff to issue payment in 2028, beyond the term

of the alimony as agreed to by the parties, such payment based on his 2027 income—including year-end bonuses—the court improperly modified the terms of the agreement. We do not agree.

We begin by setting forth the applicable standard of review. "It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . .

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity when ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citation omitted; internal quotation marks omitted.) *Brown* v. *Brown*, 199 Conn. App. 134, 144–45, 235 A.3d 555 (2020). A "contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) Id., 147.

As the court expressly found in its memorandum of decision, and as the language of the agreement clearly supports, the defendant is dependent on the plaintiff "until 2027 when both parties have agreed that alimony will certainly end." In our view, the plain and unambiguous language of the agreement indicates that the parties intended to craft an agreement that would provide the defendant with alimony for twelve years after the date of dissolution, such alimony being based on the plaintiff's earnings for that year. Section 3.1 of the agreement explicitly states that alimony would persist, with payments made on the first of each month, until the death of either party, the defendant's cohabitation, or "for an otherwise nonmodifiable term of twelve (12) years from the date of dissolution . . . ." The plaintiff was obligated to pay to the defendant a monthly alimony payment calculated in relation to his "gross annual earned income from employment." Section 3.1 of the agreement further provided that these payments "shall be made as and when [g]ross [e]arned [i]ncome from [e]mployment is received" by the plaintiff. Section 3.2 of the agreement defined gross annual earned income from employment to mean "all compensation paid and transferred by the [plaintiff's] employer to him on

account of personal services rendered by the [plaintiff] and any and all earnings of any nature received by the [plaintiff] in the form of cash or cash equivalents or which the [plaintiff] is entitled to receive from any and all sources rendered by the [plaintiff] by way of his current or future employment, before deductions . . . including but not limited to: (a) salary and/or base salary . . . (d) bonus, guaranteed bonus and/or performance awards . . . .” We reiterate that section 3.4 of the agreement specifically states: “Within thirty (30) days after December 31 of *each calendar year in which alimony and/or child support is payable to the* [*defendant*], the [plaintiff] shall provide the [defendant] with all documents necessary to confirm his gross earned income from employment from all sources, including bonuses. Not later than March 15 of each year, commencing March 15, 2016, the parties shall determine whether the [plaintiff] has paid to the [defendant] the correct amount of unallocated alimony and child support, as the case may be, for the immediately preceding calendar year.” (Emphasis added.)

In our view, the final calculation of alimony due to the defendant contemplates any bonuses awarded in 2028 for work performed through September, 2027, without improperly modifying the terms of the alimony agreement. Put differently, the agreement anticipates that the plaintiff will be entitled to receive year-end bonuses based on his employment over the previous calendar year, and that these bonuses will be calculated no later than March 15, 2028. Accordingly, we conclude that the court did not modify the terms of the alimony provision of the agreement.

The judgment is reversed in part and the case is remanded with direction to vacate the order entitling the defendant to a $20,000 reduction of the arrearage owed to the plaintiff.

In this opinion the other judges concurred.